### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ETHAN BOOK, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:20-CV-01381 (JCH) |
| v. | : | |
| | : | |
| MARK A. LAURETTI, ET AL., | : | |
| Defendant. | : | OCTOBER 3, 2022 |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 40)

### I.    INTRODUCTION

Plaintiff, Ethan Book, brings this action against defendants Mark A. Lauretti, Shawn Sequeira, and John D. Bashar in their individual capacities (collectively, "the individual defendants"), and against the City of Shelton ("Shelton"), Connecticut. Amended Complaint ("Am. Compl.") ¶¶ 2–5 (Doc. No. 12).  Book alleges four claims under sections 1983 and 1988 of Title 42 of the United States Code ("section 1983" and "section 1988") arising out of the defendants' alleged failure to timely and completely respond to Book's requests for information pursuant to the Connecticut Freedom of Information Act ("FOI Act").  See generally Id.; Conn. Gen. Stat. §§ 1-200, et seq.

Book filed the instant action on November 7, 2020, claiming that deficiencies in the defendants' responses to his FOI requests, made in 2018 and 2019, violated his civil rights.  With respect to the requests made in 2018, Book cites the delayed and incomplete provision of the applicants' materials for defendant Sequeira's police chief position the year Sequeira was hired.  With respect to the requests made in 2019, he cites the loss of the Shelton Police Department timeclock area video footage.  Book argues that he made these requests to gather information "in order to establish that his election opponent [Christopher Rosario] was corrupt" so that he could obtain political

1

office. Additional Material Facts ("Pl.'s AMF"), Pl.'s R. 56(a)2 Stmt. ¶ 10 (Doc. No. 41-1).

Through the defendants' allegedly deliberate delays and omissions in their FOI

responses, Book claims that they violated his rights to (1) freedom of speech; (2)

"freedom to petition for redress of grievances"; (3) procedural due process; and (4)

substantive due process, "all as guaranteed by the First and Fourteenth Amendments

. . . ." Am. Compl. ¶ 23.[1]

Now before the court is the defendants' Motion for Summary Judgment (Doc. No.

40), which Book opposes.  See Defs.' Mot. for Summ. J. ("Defs.' Mot.") (Doc. No. 40);

Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Doc. No. 40-1); Pl.'s Mem.

of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 41); see also Reply

to Opp'n to Mot. for Summ. J. ("Defs.' Reply") (Doc. No. 42).  For the reasons set forth

below, the court grants the defendants' Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND[2]

Book is a Connecticut resident and long-time member of the Republican Party

who is active in local politics.  Pl.'s AMF ¶ 1.  Book ran as the "Republican-endorsed

---

[1] In their Motion, the defendants also moved for summary judgment on Book's "claim" of "garden variety emotional distress".  See Defs.' Mot. at 2; see also Defs.' Mem. at 19–22.  In his Amended Complaint, Book appears to have pled emotional distress as a form of injury resulting from the defendants' alleged violations of law, rather than an independent claim of liability, see Am. Compl. ¶ 23 ("The said violations have caused [Book] 'garden variety' emotional distress"), and he does not brief the issue in his Opposition Memorandum, see generally Pl.'s Mem.

The court construes the Amended Complaint's "emotional distress" reference as a form of injury and does not address it as a claim.  If it were a claim, it would be dismissed with the other abandoned claims.  See, infra, Sections IV.D.2–3.

[2] The court draws primarily from the parties' Local Rule 56(a) Statements and supporting exhibits in summarizing the material facts, construing those facts in the light most favorable to Book.  In Book's Local Rule 56(a)2 Statement, Attorney Williams failed to "include a reproduction of each numbered paragraph in the moving party's Local Rule 56 (a)1 Statement", in violation of the Local Rule.  D. Conn. L. Civ. R. 56(a)2(i).  For ease of reference, the court therefore cites only to the defendants' Local Rule 56(a)1 Statement where the statement is undisputed.

candidate" against Christopher Rosario in 2014, 2016, 2018, and 2020, in the 128th

Assembly District located in Bridgeport, Connecticut.  Am. Compl. ¶ 1.  In connection

with his pursuit of political office, Book made several requests pursuant to the FOI Act

(hereinafter, "FOI Requests") to the Mayor of Shelton, defendant Lauretti, for

information pertaining to several Shelton City employees.  Defendants' Local Rule

56(a)1 Statement of Material Facts ("Defs.' R. 56(a)1 Stmt.") ¶¶ 1–2 (Doc. 40-2); see

also Book Deposition part I ("Book Dep. I"), Defs.' Ex. A-1 at 44:7–10, 45:4–21, 61:4–25

(Doc. No. 40-3); Book Deposition Part II ("Book Dep. II"), Defs.' Ex. A-2 at 62:13–63:5

(Doc. No. 40-4).  The responses to these requests form the basis of Book's case.

     A.    <u>Record on Summary Judgment</u>

     It is first necessary for the court to address the record and memoranda filed by

both plaintiff's and defendants' counsel relating to the pending Motion for Summary

Judgment.  In their Memoranda, the parties have referred to two specific dates as being

those on which Book made his critical FOI Requests: October 17, 2018, and April 25,

2019.  <u>See</u> Defs.' R. 56(a)1 Stmt. ¶ 1 ("The plaintiff's two FOI requests to the City of

Shelton at issue in this case are dated October 17, 2018, and April 25, 2019."); Pl.'s

Statement of Material Facts at ¶ 2 ("Pl.'s R. 56(a)2 Stmt.") (Doc. No. 41-1) ("Admitted.").

A review of both the record and the parties' briefings, however, shows that Book sent

several letters requesting various information on several different dates, which often do

not correlate with the two identified by counsel at the start of their Local Rule 56(a)

Statements.  <u>Compare, e.g.</u>, Conn. Freedom of Info. Comm'n Final 2019 Decision

("2019 FOIC Decision"), Defs.' Ex. H ¶ 2 (Doc. No. 40-15)[3] with Defs.' R. 56(a)1 Stmt ¶ 2 and Pl.'s R. 56(a)2 Stmt. ¶ 2; compare also Conn. Freedom of Info. Comm'n Final 2020 Decision ("2020 FOIC Decision"), Defs.' Ex. O ¶ 2 (Doc. No. 40-22) with Defs.' R. 56(a)1 Stmt. ¶ 15.

For instance, the information the parties agreed in their Local Rule 56(a) Statements was sought on the first of the two specified dates, October 17, 2018, appears in part to have been included in a separate FOI letter dated October 18.  See 11/8/2018 Book Letter to FOIC ("2018 FOIC Complaint"), Defs.' Ex. G at 1–2 (Doc. No. 40-14) (stating that Book asked for hiring documentation associated with defendant Sequeira on October 17 and, on October 18, asked for the timesheets of political opponent Rosario).  Still more information referenced in the defendants' summary judgment materials was requested on October 20, 2018.  See 11/1/2018 Bashar Email to Book, Defs.' Ex. D (Doc. No. 40-7) (stating "there is a package for [Book] to pick up at the Mayor's office consisting of the City's response to [his] request for documents for payments made to Christopher Rosario apart from his regular hourly compensation."); 2018 FOIC Complaint at 2 (stating that, on October 20, 2020, Book requested "documentation which reflects any and all financial payments made by the City of Shelton to Mr. Rosario apart from his regular hourly compensation.").

---

[3] While the court does not accept the conclusions made in the 2019 and 2020 FOIC Decisions, produced by the defendants, as binding for the purposes of this Ruling, the Decisions are often the only source of information about what was requested, and what was provided, and when.  In his Opposition Memorandum and Local Rule 56(a) Statement, Book does not specifically address the FOIC Decisions. Additionally, neither Book nor the defendants come forward with any evidence contrary to the Decisions' descriptions of what was requested and when.  The court cites to the FOIC Decisions only when necessary to fill in a timeline: the court does not rely on the Decisions to make its Ruling on the defendants' Motion.

The same is the case for FOI requests made in April 2019.  <u>See</u> Defs.' R. 56(a)1 Stmt. ¶¶ 1 ("[t]he plaintiff's two FOI requests . . . at issue . . . are dated October 17, 2018, and April 25, 2019"), 13 ("[o]n April 22, 2019 and April 25, 2019, the plaintiff sent FOI requests"), 15 ("[o]n May 15, 2019, the plaintiff filed a complaint with the FOIA Commission pertaining to his April 22, 2019 FOI request only, not as to his April 25, 2019 FOI request"); <u>see also</u> Pl.'s AMF ¶ 9 ("The purpose of plaintiff's April 22, 2019, FOIA request . . . was that there are two police officials who have reputations for adding their over time . . . . It's all politically interconnected"); Book Dep. II at 67:1–14 ("Q: Okay. . . .  [J]ust so we're clear, the April 25th, 2019[ ] FOI request, that's what's part of this lawsuit, correct? A: Yes. [. . . Q:] So then, the two FOI requests at issue in this amended complaint are October 17, 2018, and April 25th, 2019, correct? A: Yes.").

Because the heart of Book's case rests more on the <u>responses</u> to his FOI Requests than the specific dates on which they were made, the court has simplified the confusion created by counsel's filings for the purposes of this Opinion.  Mindful of the court's obligation, on a motion for summary judgment, to construe evidence and draw all reasonable inferences in Book's favor, the court described the dates as they were accurately reflected in record and, moving forward, refers to the various Requests generally as (1) the October 2018 Request ("2018 Request"), and (2) the April 2019 Request ("2019 Request").

B.    <u>October 2018 Request</u>

The first group of Book's FOI Requests took place in October 2018, with the first being made on the seventeenth.  Defs.' R. 56(a)1 Stmt. ¶ 1.  Suspicious that defendant Sequeira was not actually qualified for his position as Police Chief, Am. Compl. ¶ 13, Book sent a letter to Lauretti on October 17 to request numerous documents related to

Sequeira's "employment by the City of Shelton . . . for work in the Police Department",
10/17/2018 Book Letter to Lauretti, Defs.' Ex. B at 1 (Doc. No. 40-5).  Explaining that
the documents "ha[ve] much public significance[,] including political implications for the
re-election bid of . . . [Rosario] and of [Book's] challenge candidacy [sic] for that same
position", Book requested information such as the names and applications of all
individuals who had applied for the position of Police Chief, "copies of the essays and
grades for the essays of each applicant", and "documentation which reflects the review
and decision process for selecting a candidate for the position of Police Chief" for the
year that defendant Sequeira was selected and hired to fill the position.  Id.; see also
2019 FOIC Decision ¶ 2.  On October 18, 2018, Book sent another Request to
defendant Lauretti for "documentation which reflected the time periods that Christopher
Rosario was working in his part-time position as Clerk with the Shelton Police
Department from October 5th to the date of [this] letter."  2018 FOIC Complaint at 2.

Finally, on October 20, 2018, Book sent one more request to Lauretti for
"documentation which reflects any and all financial payments made by the City of
Shelton to Mr. Rosario apart from his regular hourly compensation."  Id.  Book sought
this information because "there had been a lot of talk about . . . unethical and illegal
conduct by officials of the City of Shelton and questions about why [defendant] Lauretti
hired Chris Rosario and what he's doing and if he was doing anything."  Book Dep. I at
45:12–16; Pl.'s AMF ¶ 3.

Lauretti forwarded these Requests to his assistant, defendant Bashar, to provide
responsive documents.  Affidavit of Mark A. Lauretti ("Lauretti Aff."), Defs.' Ex. T ¶ 6
(Doc. No. 40-27); see also Am. Compl. ¶ 14 (alleging same).  Bashar emailed Book on

6

October 19, 2018, to notify him of the City's receipt of his Request for "records regarding Shawn Sequeira" and that the records would be ready by the beginning of the following week.  See 10/19/2018 Bashar Email to Book, Defs.' Ex. C (Doc. No. 40-6); Defs.' R. 56(a)1 Stmt. ¶ 4.  Bashar emailed Book again on November 1, 2018, notifying him that the information requested on October 20 was available for pickup at the Mayor's Office, and that he "should have the last request . . . regarding Shawn Sequeira" the following Monday.  See 11/1/2018 Bashar Email to Book; Defs.' R. 56(a)1 Stmt. ¶ 5.  Despite defendant Bashar's initial assurance that the requested documents related to Sequeira's hiring would be available by the end of October, it was not until approximately November 30, 2018, that the relevant documents were even assembled. 2019 FOIC Decision ¶¶ 12–13; see also December 2018 Book and Bashar Email Chain ("December 2018 Emails"), Defs.' Ex. F at 1 (Doc. No. 40-13) (emailing on December 11 to say that Bashar "[took] exception to [Book's] allegation that the City's Response to [his] request was 'late' . . . . [T]he City responded on or about November 30th").  Bashar notified Book of this fact by email on December 5, 2018.[4]  December 2018 Emails at 1. Despite efforts to locate them, the applicants' essays were never provided.  2019 FOIC

---

[4] There is a mutual error in the parties' Local Rule 56(a) Statements with regard to this December 5, 2018 date: the defendants state that, "[o]n November 5, 2018, Bashar emailed [Book] yet again that there was a package ready for pickup in response to his October 17, 2018[,] FOI request[.]"  Defs.' R. 56(a)1 Stmt. ¶ 6 (emphasis added).  Book's Local Rule 56(a) Statement denies this as "significantly misleading" but agrees that the email was sent on "November 5, 2018."  Pl.'s R. 56(a)2 Stmt. ¶ 6.

Neither party's description is completely accurate.  First, Bashar's email in question was sent on December 5, 2018.  See December 2018 Emails at 3 (email dated "Dec 5, 2018").  The defendants' statement that this email notified Book "yet again" that a package responsive to his October 17 Request for police chief applications is incorrect: the defendants have cited to nothing in the record showing a prior email to Book saying the same.  See generally Defs.' R. 56(a)1 Stmt.  Indeed, the contents of the package itself specifically show that the information was put together six days prior to December 5, 2018. City of Shelton's Response to October 17, 2018 Request part I, Defs.' Ex. E-1 at 1 (Doc. No. 40-8) (letter dated November 30, 2018).

Decision ¶ 15; City of Shelton's Response to October 17, 2018 Request part I ("Shelton's Response I"), Defs.' Ex. E-1 at 2 (Doc. No. 40-8) (internal quotations omitted) ("[T]he city does not have any copies of the essays of each applicant."); see also Defs.' R. 56(a)1 Stmt. ¶ 24. Finally, the record does not reflect whether Rosario's timesheet information, requested on October 18, 2018, was ever provided. The election, in connection with which Book intended to use the information, took place on November 6, 2018. Pl.'s AMF ¶ 9 (citing Plaintiff's Supplemental Responses to Defendants' Interrogatories and Requests for Production, ("Book Supp. Resps."), Pl.'s Ex. 1 at 4 (Doc. No. 41-2)).

      C.    April 2019 Requests

      The second FOI request at issue in this case was made on April 25, 2019. Defs.' R. 56(a)1 Stmt. ¶ 1.[5] Book again addressed the request to defendant Lauretti, this time seeking, inter alia, "[a]ccess to the video recording of the Shelton Police Department time clock for the period of March 1, 2019, to [April 25, 2019,]" and "information regarding hours clocked in for work by [Mr.] Rosario . . . from October 5, 2018[,] to" April 25, 2019. 2020 FOIC Decision ¶ 2(b); see also Defs.' R. 56(a)1 Stmt. ¶ 24. Lauretti again forwarded Book's request to defendant Bashar. Lauretti Aff. ¶ 6. Bashar provided all "records responsive to [Book's] request . . . on or about October 10, 2019", except the requested video recordings. 2020 FOIC Decision ¶ 10; see also Defs.' R. 56(a)1 Stmt. ¶ 24. The video recordings were maintained by the Shelton Police Department, not the Mayor's Office and, by the time Book's request for the video recordings was received by the appropriate party, the recordings were no longer

---

[5] See also Section II.A, supra (discussing additional FOI Request on April 22, 2019).

available: "the footage at issue [was] automatically recorded over every thirty days."

Defs.' Mem. at 5 (quoting 2020 FOIC Decision ¶ 13); see also Pl's Supp. Resps. at 8–9.

The defendants moved for summary judgment on all claims on February 3, 2022.

Defs.' Mot at 1.  For the reasons explained below, the court grants the defendants'

Motion.

## III.   STANDARD OF REVIEW

A motion for summary judgment may be granted only where the moving party

can establish that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64,

71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party

must set forth specific facts demonstrating that there is indeed "a genuine issue for

trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir.

2016).  Unsupported allegations do not create a material issue of fact and cannot

overcome a properly supported motion for summary judgment.  See Weinstock v.

Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine

whether there are disputed issues of material fact, the trial court must "resolve all

ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir.

1995).

## IV.    DISCUSSION

### A.    Personal Involvement

Liability under section 1983 does not attach to a defendant without "personal involvement . . . in [the] alleged constitutional deprivations . . . ."  Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (internal citations omitted).  Defendants Sequeira and Lauretti both argue that the claims against them should be dismissed for lack of personal involvement.  Defs.' Mot. at 1; Defs.' Mem. at 6–7.

#### 1.    Defendants Sequeira and Lauretti

Sequeira argues that the section 1983 claim against him fails as a matter of law because he "had no personal involvement in responding to either of [Book's] FOI requests at issue in this case."  Id. at 7; see also Affidavit of Sequeira, Defs.' Ex. S ¶ 8 (Doc No. 40-26).  Book "concedes that there is no evidence linking Sequeira personally to these matters, and accordingly his motion may be granted by agreement."  Pl.'s Mem. at 5.  Because both parties agree that Sequeira had no personal involvement in this case, the court grants summary judgment for Sequeira.

Lauretti similarly moves for summary judgment on the ground that, because he merely passed Book's letters on to Bashar, he had no personal involvement in the response to Book's FOI requests.  Defs.' Mem. at 7.  Book disagrees, claiming that Lauretti "has failed to sustain his burden on a summary judgment motion of proving that no jury could find him personally responsible."  Pl.'s Mem. at 5.  Although the party moving for summary judgment does bear the initial burden of establishing facts in favor of his motion, when a moving party "documents his motion, setting forth specific facts denying the claims, the opposing party must [ ] 'set forth specific facts showing that there is a genuine issue for trial.'"  Williams, 781 F.2d at 323 (citing Fed. R. Civ. P.

56(e)).  Here, in support of his argument that he had no personal involvement, Lauretti offers his sworn Affidavit as support.  See Lauretti Aff.

Book argues that "there is sufficient circumstantial evidence to support a jury finding that Lauretti was behind the denial of [his] right of access."  Pl.'s Mem. at 5. However, as the defendants correctly point out, the "items in the record [Book] cites to in support of his alleged denial . . . have nothing to do with the facts alleged."  Defs.' Reply at 1.  Book produced two exhibits on the record: (1) a copy of Book's supplemental responses, without attachments of the exhibits referenced therein, to the defendants' interrogatories and requests for production, and (2) a copy of defendant Bashar's responses to Book's interrogatory and requests for production.  Neither exhibit relates to "what Mark Lauretti may or may not have done, and more specifically, any involvement he might have had, in responding to either of the plaintiff's FOI requests." Id.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  In Tangreti v. Bachmann, the Second Circuit clarified the standard applicable to supervisory defendants in cases concerning alleged violations of constitutional rights under section 1983.  Joining other Courts of Appeals that have addressed the issue, the Second Circuit held that, "after Iqbal, there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (emphasis

added) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009)).  Critically, [t]he violation must be established against the supervisory official <u>directly</u>."  <u>Id.</u> (emphasis added).

Here, the record only reflects that defendant Lauretti, as defendant Bashar's boss, forwarded Book's requests to Bashar to address.  Lauretti Aff. ¶ 6; <u>see also</u> Am. Compl. ¶ 14.  Book has come forward with no evidence that Lauretti was directly involved in the FOI response.  Further, Book failed to seek discovery from Lauretti to determine what involvement, if any, he did have in responding to Book's FOI Requests. Defs.' Reply at 5.

In the absence of admissible evidence to support a reasonable juror's finding that Mr. Lauretti had personal involvement in this case, the court grants summary judgment in favor of defendant Lauretti.

2.      Defendant Shelton

The defendants argue that Book failed to properly allege municipal liability under section 1983 against Shelton because Book's claim against Shelton was not fashioned under the <u>Monell</u> framework.  Defs.' Mem. at 7–9.  Book responds that the defendants have "misse[d] the point", and that he "d[id] not invoke respondent superior" and instead alleged that Shelton "acted directly in this case."  Pl.'s Mem. at 5.  This "direct" liability, Book argues, stems from the fact that "some of [Book]'s FOIA requests were directed to [Shelton] rather than to [Lauretti] and, both of them, separately and individually, were parties to the [FOIC] proceedings".  <u>Id.</u>

In <u>Monell v. New York City Dept. of Social Services</u>, the Supreme Court wrote that "Congress did not intend municipalities to be held liable [under section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."

12

436 U.S. 658, 691 (1978).  Though treated as a "person" for the purposes of section 1983, municipalities can only act to cause a constitutional tort through the actions of its agents.  The Court later explained that its conclusion in Monell—that Congress "doubt[ed] its constitutional power" to impose civil liability on municipalities "in order to oblige municipalities to control the conduct of others"—led Congress to "cho[o]se not to create such [respondeat superior] obligations in § 1983."  Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986) (referencing Monell, 436 U.S. at 692) (emphasis added).

Because "Congress never questioned its power to impose civil liability on municipalities for their own illegal acts", the Monell Court proceeded to outline the standard applied to "direct" municipal liability.  Id. (emphasis added).  To establish Shelton's liability for the constitutional violations here, Book needs to come forward with sufficient evidence upon which a reasonable juror could find: (1) "that [he] suffered a constitutional violation", and; (2) "that the violation resulted from an identified municipal 'policy,' 'custom,' or 'practice.'"  Parker v. City of Long Beach, 563 Fed. App'x 39, 41 (2d Cir. 2014) (summary order) (citing Monell, 436 U.S. at 690–91 (1978)).  Book has come forward with no evidence from which a reasonable juror could infer that Shelton had any policy, custom, or practice bearing on the actions of the otherdefendants in this case.

A policy, custom, or practice "need not be memorialized in a specific rule or regulation."  Crawley v. City of Syracuse, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (quoting Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996)).  Nor must it have "received formal approval through the body's official decisionmaking channels."  Monell, 436 U.S. at 691.  For instance, "when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to

13

attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004).  However, "the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of . . . fact[s] tending to support, at least circumstantially, such an inference."  Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).  Indeed, a plaintiff can establish a city's policy or custom, for purposes of 1983 liability, if he comes forward with evidence that "a policymaking official exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice . . . .'"  Amnesty America, 361 F.3d at 126 (quoting City of Canton, 489 U.S. 378, 388 (1989)).

Here, Book has come forward with no such evidence: not that Shelton has a formal policy or custom, nor that any "policymaking officials" effectively ratified Bashar's conduct such that it could be construed as a municipal policy or custom.[6]  Nor is there any evidence in the record of deliberate indifference by a policymaker.[7]  Without such evidence, no reasonable juror could find Shelton liable for any violations of Book's constitutional rights under section 1983.

Therefore, the court grants summary judgment in favor of the City of Shelton.

---

[6] This failure, on the part of Book's counsel, is particularly surprising given that Attorney Williams was plaintiff's counsel in Amnesty America.

[7] Because the record is devoid of any evidence of deliberate indifference by Lauretti, the court need not consider whether, under Amnesty America, isolated incidents of alleged constitutional deprivations by a single subordinate, like Bashar, would be sufficient to treat deliberate indifference by a supervisor, like Lauretti, as a "deliberate choice" that meets the standard for municipal liability.

B.     Collateral Estoppel

Defendants also argue that "all of [Book]'s claims fail as a matter of law due to the doctrine of collateral estoppel . . . [because] the issues presented in the subject litigation were fully litigated and decided before the [FOIC]."  Defs.' Mem. at 5.  The court is not convinced.

Collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim."  Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 32 (2d Cir. 2017) (internal quotation marks omitted).  "An issue decided against a party in a prior proceeding may not be relitigated if: (1) it was fully and fairly litigated in the first action; (2) it was actually decided; and (3) the decision was necessary to the judgment."  Id. (internal quotation marks omitted).  A decision was necessary to the judgment "if [,] in the absence of a determination of the issue, the judgment could not have been validly rendered."  Id. (internal quotation marks omitted).

Even assuming that a state agency's decision could have estoppel effect in a federal litigation, the defendants' argument fails because the FOIC did not decide on any of the issues before this court in the instant case.  As Book correctly points out, the essence of the FOIC's decisions was "whether the acts and omissions of the defendants violated the [FOI Act]."  Pl.'s Mem. at 4.  Making this determination required that the FOIC also decide related questions, such as (1) whether it was incumbent on Bashar to forward Book's April 2019 Request to the appropriate department or (2) whether the defendants maintained, or should have maintained, the essay responses from Book's October 2018 Request.  However, the FOIC only considered these related questions to resolve the ultimate issue of whether or not the defendants had violated

15

Book's rights under Connecticut's FOI Act, not the First Amendment.[8]  For instance, the

FOIC did consider the issue of timeliness: whether the time it took to produce

documents violated Book's right, under the FOI Act, "to inspect [his requested] records

promptly . . . ."  Conn. Gen. Stat. § 1-19(a).[9]  The FOIC did not, however, consider

whether the time it took the defendants to produce documents was intentionally

extended in order to prevent Book from using the documents in his political speech.

The defendants' argument that this action is barred by collateral estoppel is

unpersuasive.

      C.    <u>First Amendment Claim</u>

          1.    Type of Claim

As the Supreme Court explained, "the First Amendment has its fullest and most

urgent application to speech uttered during a campaign for political office."  <u>Citizens</u>

<u>United v. Fed. Election Comm'n</u>, 558 U.S. 310, 339–40 (2010) (citing <u>Eu v. San</u>

<u>Francisco Cnty. Democratic Central Comm.</u>, 489 U.S. 214, 223 (1989); <u>Buckley v.</u>

<u>Valeo</u>, 424 U.S. 1, 14 (1976) (per curium) ("Discussion of public issues and debate on

the qualifications of candidates are integral to the operation of the system of

government established by our Constitution")).  Book argues that Bashar, as the sole

remaining defendant, violated his First Amendment rights when responding to (1)

---

[8] In fact, an FOI Act violation is not also a violation of the First Amendment.  <u>See</u> <u>McBurney v.</u>
<u>Young</u>, 569 U.S. 221, 232 (2013) (collecting cases) ("This Court has repeatedly made clear that there is
no constitutional right to obtain all the information provided by FOIA laws."); <u>see also</u> <u>McGehee v. Casey</u>,
718 F.2d 1137, 1147 (D.C. Cir. 1983) (internal citations omitted) (collecting cases) ("As a general rule,
citizens have no first amendment right of access to traditionally nonpublic government information. . . . A
litigant seeking release of government information under FOIA, therefore, relies upon a statutory
entitlement—as narrowed by statutory exceptions—and not upon his constitutional right to free
expression.").

[9] It bears noting that the FOIC found the defendants' responses to Book's 2018 Request be
timely under the FOI Act.  <u>See</u> 2019 FOIC Decision ¶ 17.

Book's 2018 Requests, because the information was (a) incomplete, for lack of applicant essays and (b) provided <u>after</u> the election for which it was sought; and (2) Book's 2019 Request, because the requested video footage was never provided. These late and deficient responses, Book argues, interfered with his First Amendment right to free political speech: "[h]e was muzzled by [the defendants]" because he was unable to use the missing materials in his campaign efforts.  Pl.'s Mem. at 6.

A plaintiff seeking to successfully vindicate his rights under the First Amendment should clearly indicate the legal framework a court should apply in its analysis of his particular claim.  This includes not only the type of speech, but its medium, the setting in which it is made, as well as the type of restraints to which it was, or will be, subjected. Indeed, the Supreme Court has cautioned that "[e]ach method of communicating ideas is 'a law unto itself'[,] and that law must reflect the 'differing natures, values, abuses and dangers' of each method." <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 501 (1981) (quoting <u>Kovacs v. Cooper</u>, 336 U.S. 77, 97 (1949) (Jackson, J., concurring)). For example, "[t]here is a crucial distinction between retaliatory First Amendment claims and affirmative First Amendment claims (<u>e.g.</u>, facial challenges to statutes, challenges to prior restraints)." <u>Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency</u>, 77 F.3d 26, 31 (2d Cir. 1996).  For "retaliatory claims, the [Supreme] Court has emphasized the significance of the subjective state of mind of the state actor; however, with most affirmative claims [, such as claims against content-based restrictions on speech by state statutes], the Court has focused on the objective nature of the challenged restriction."  <u>Id.</u> at 31–32.

In their Motion for Summary Judgment, the defendants address Book's First Amendment claim as one of retaliation.  Defendants argue that, under a retaliation framework, Book's claim fails because Bashar's FOI Act responses "were not motivated by [Book]'s exercise of his First Amendment Rights . . . ."  Defs.' Mot. at 1.  In his Opposition Memorandum, Book argues that his claim "is not a free speech retaliation action . . . [because he] never has claimed that the defendants punished him for exercising his free speech rights."  Pl.'s Mem. at 6.  However, Book does not provide this court with an alternative First Amendment framework.  Further, it is not necessary to claim that the defendants <u>punished</u> him for his First Amendment speech for a retaliation framework to apply.  Indeed, while the Second Circuit has held that there is a question of subjective intent when addressing a First Amendment retaliation claim,[10] this intent does not need to be to punish the speaker.  In fact, retaliation cases in this Circuit often involve action intended to <u>chill</u> <u>future</u> speech, rather than merely punish past speech.  <u>See, e.g.</u>, <u>Di Lello v. Coviello</u>, No. 20 CV 9180 (VB), 2022 WL 161492, at *4 (S.D.N.Y. Jan. 18, 2022) (internal citations omitted) (denying motion to dismiss retaliation claim where plaintiff alleged that the defendant official threatened to "have [the plaintiff] arrested unless he stopped his [First Amendment] efforts"); <u>Macera v. Vill. Bd. of Ilion</u>, No. 616CV668LEKTWD, 2019 WL 4805354, at *17–19 (N.D.N.Y. Sept. 30, 2019) (granting summary judgment in favor of police chief where plaintiffs failed to raise a genuine dispute of material fact that the chief intended, in failing to have officers enforce a parking regulation, to deter plaintiffs' exercise of First Amendment rights).  While the

---

[10] <u>See, e.g.</u>, <u>Curley</u>, <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 73 (2d Cir. 2001) ("[s]pecific proof of improper motivation is required . . . to survive summary judgment on a First Amendment retaliation claim") (citing <u>Blue v. Koren</u>, 72 F.3d 1075, 1082–83 (2d Cir. 1995)).

court acknowledges that a retaliation framework may not squarely fit Book's First Amendment claim in this case, the court is unaware of a more fitting framework, especially in the face of Book's failure to argue his claim under any First Amendment framework at all.[11]  In the absence of a recommended alternative and because a retaliation framework fits best, the court views Book's claim as one of First Amendment retaliation.

To survive a motion for summary judgment on a First Amendment retaliation claim under which a plaintiff, like Book, claims chilled First Amendment speech as an injury, the plaintiff must come forward with facts upon which a reasonable juror could find "(1) [the plaintiff] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." Curley, 268 F.3d at 73.

2.      Retaliatory Intent

To say that Book argues at a very broad level is a gross understatement.[12]  He claims that his "case involves the suppression of political speech by a municipality and its highest officials, acting under color of law, in violation of the First Amendment to the

---

[11] To paraphrase the Second Circuit's admonition to Book's counsel in Sioson v. Knights of Columbus:

> Perhaps counsel for [Book] intends that [this court] form[s] an argument for him, by looking into the record to [find support for] the "facts" posited in his [Opposition materials] and then examining various combinations of these facts in the light of the [possible First Amendment] doctrines he [failed to] mention[ ]. But that is simply not [this court's] job, at least in a counseled case.

303 F.3d 458, 460 (2d Cir. 2002).

[12] In the twenty-five lines of his Memorandum that Book's counsel devotes to his First Amendment claim, he does not cite to any record evidence and does not address intent.  See Pl.'s Mem. at 6–7.

Constitution . . . ."  Pl.'s Mem. at 1.  Book further contends that he "has been limited and

thus restrained in exercising his First Amendment right to political speech because

evidence which does (or did) exist was intentionally concealed from him by [Bashar],

acting under color of law, so that he could not utilize it in his political campaign."  Id. at 6

(original emphasis omitted).  As support for this claim, Book points Bashar's responses

to both his 2018 and 2019 Requests: (1) the late, and incomplete application materials

for defendant Sequeira's position at the Police Department, requested in October 2018;

and (2) the missing footage of the clock-in area at the Shelton Police Department,

requested in April 2019.  The defendants, on the other hand, argue that Book's First

Amendment retaliation claim fails on the second prong of the retaliation framework: any

deficiencies in the responses to which Book points "were not motivated by the plaintiff's

exercise of his First Amendment Rights . . . ."  Defs.' Mot. at 1.

At the outset, the court appreciates the potential seriousness of a city withholding

important information from a political candidate for the purposes of "limit[ing] and thus

restrain[ing] [the candidate] from exercising [his] First Amendment right to political

speech . . . ."  Pl.'s Mem. at 6.  However, while the court must draw all inferences in

Book's favor, Book "may not rely upon 'conclusory statements or mere allegations' but

must 'go beyond the pleadings, and by his . . . own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts'" permitting a

reasonable juror to find in his favor.  Frye v. Lagerstrom, No. 20-3134, 2021 WL

4022695, at *2 (2d Cir. Sept. 3, 2021) (summary order) (quoting Davis v. New York, 316

F.3d 93, 100 (2d Cir. 2002)).  In this case, Book has failed to identify any evidence upon

which a reasonable juror could find that Bashar acted with the intent of limiting Book's exercise of his First Amendment rights.

Book's entire claim—that Bashar responded to Book's FOI Requests the way he did with the purpose of chilling Book's political speech—relies on the inference that the defendants had something to hide.  Book argues that there was evidence of corruption, which the defendants tried to hide by (1) delaying their FOI responses, supposedly evidenced by Bashar's provision of the police chief applications one month after the 2018 election in which Book stated he would use them;  and (2) failing to obtain the evidence altogether, as evidenced by the loss of the police chief applicants' essay responses sought in Book's 2018 Request and the video footage sought in 2019.  See Sections II.B–C, supra.  However, if the information Book sought did not contain evidence of corruption by Rosario or the defendants, Book is left without any support for his allegation that Bashar acted with any retaliatory intent, be it punishment for past or prevention of future political speech, in answering Book's Requests.  After all, to support such an inference of intent, there logically must be some evidence of corruption in the first place.  Therefore, if any of the allegations of corrupt conduct in Book's Amended Complaint were supported by references to evidence in the record, he may have at least some basis upon which a reasonable juror could infer bad intent.  That is, a juror could find there actually may have been something to hid and thus a motive for Bashar to hide it.  Assuming such an inference would be sufficient to avoid summary judgment, the record lacks such admissible evidence.

Book cites to his own testimony claiming that Shelton officials were politically corrupt because "there had been a lot of talk about . . . unethical and illegal conduct by

officials" there.  Pl.'s AMF ¶ 3 (citing Book Dep. I at 45:12–16).  However, without any

admissible, corroborating evidence of such conduct, this assertion is not a basis for a

reasonable juror to find that such corrupt conduct existed.  For one thing, Book's

testimony about 'talk' he heard, if offered to prove that what the 'talk' said was true and

Shelton officials were corrupt, would likely be inadmissible as hearsay unless shown to

be within an exception.  Granted, Federal Rule of Civil Procedure 56 does not require

that the form of evidence provided at the summary judgment stage be admissible.[13]

This court's Local Rules, however, do.  See D. Conn. L. Civ. R. 56(a)(3) ("each

statement of material fact . . . must be followed by a specific citation to . . . evidence that

would be admissible at trial").  Book's testimony does not meet this requirement.  Book

had the opportunity, for example, to depose one of the sources of this "talk" about

"unethical and illegal conduct" to develop admissible evidence, but he did not do so.[14]

Of course, the court is aware that Book is claiming that the defendants' FOI

responses prevented him from obtaining evidence of political corruption in the form of

the essay responses and video footage.  The standard on summary judgment does not

require that Book provide what he cannot obtain.  However, while Book contends that

"circumstantial evidence" supports his claims of political corruption, and the defendants'

intent to hide this corruption by withholding and delaying FOI responses, Pl.'s Mem. at

---

[13] However, under the Federal Rules, the proponent of inadmissible evidence must at least "explain the admissible form [of the evidence] that is anticipated or to explain the admissible form that is anticipated" in order for such evidence to create a genuine dispute of material fact barring a grant of summary judgment.  Fed. R. Civ. P. 56 (comments to 2010 Amendments).

[14] Nor is this the first time that Book's attorney, Mr. Williams, has provided such a deficient record. See, e.g., Quoka v. City of W. Haven, 64 F. App'x 830, 832 (2d Cir. 2003) (affirming summary judgment in favor of defendants because, inter alia, Mr. Williams "failed to identify admissible evidence in the record demonstrating the existence of genuine issue of material fact in dispute").

5, Book has failed to come forward with, and to cite to, such circumstantial evidence in the record or his Memorandum.  Instead, Book makes unsupported assertions.  Indeed, without additional specific evidence on the record, Book's entire claim rests solely on the assertion that the defendants "acted jointly and in concert with each other for the specific purpose of denying [Book] his statutory right to public records that he could utilize in presenting his case to voters in his Assembly District."  Am. Compl. ¶ 22 (emphasis added).  This assertion, alone, is insufficient for a reasonable juror to infer that there was any 'intent' behind the deficiencies in Bashar's FOI responses in the first place—much less that this supposed 'intent' was to chill Book's political speech.

In his Amended Complaint, Book alleged that he sought the Shelton police chief applications, in his 2018 Requests, because he believed that defendant Sequeira "lacked the necessary qualifications" for that position.  Am. Compl. ¶ 13.  However, in his Opposition Memorandum and Local Rule 56(a)2 Statement (hereinafter, "Opposition materials"), Book has not cited to evidence in the record to support this conclusion. Although Book has produced, as Exhibit 1 to his Additional Material Facts, a copy of his Supplemental Answers to Defendants' Interrogatories and Requests for Production, he references it only twice in his Opposition materials.[15]  See Book Supp. Resps.  In one of those Supplemental Answers, Book references the material that Bashar produced in response to his 2018 Request regarding Sequeira's qualifications relative to other police chief applicants.  Id. at p. 18 (answering paragraph 18 of defendants' Requests for

---

[15] See Pl.'s AMF ¶¶ 9–10 (citing Exhibit 1 as support for the statements that (1) "[t]he 2018 election took place on November 6" and (2) "[i]mportant documents and physical evidence which the plaintiff requested in order to establish that his election opponent was corrupt either were withheld from the plaintiff until after the election or were withheld altogether").

Production).  However, despite being drafted by experienced counsel, Book's

Opposition materials contain no arguments on, or even any citations to, this

Supplemental Answer.  Further, to the extent that this Answer does state that the

documents produced in response to his 2018 Request demonstrate Sequeira's lack of

police chief qualifications, the Answer itself would be inadmissible hearsay without the

additional provision of the documents themselves.  Book has failed to come forward

with these documents.[16]  The Federal Rules of Civil Procedure make clear that "[t]he

court need only consider the cited materials" in deciding a motion for summary

judgment.  Fed. R. Civ. P. 56(c)(3).  The court, therefore, declines to consider Book's

single, uncited, supplemental answer for the purposes of this Ruling.  Book's claim that

Sequeira was unqualified for his position, like the evidence of Rosario's timesheet

misconduct, remains unsupported by the record.

The record is also devoid of admissible evidence supporting an inference that the

video footage Book requested in 2019 was intentionally lost, or that the footage may

have contained evidence of corruption.  Thus, even construing all disputed facts in favor

of Book—that the 2018 Request was responded to late; that the defendants should

have tracked down the essay responses; that the defendants should have referred

Book's request for video footage to the Police Department sooner—no reasonable juror

---

[16] These documents were produced on the Summary Judgment record by the defendants, as Exhibit E to their Local Rule 56(a)1 Statement.  See City of Shelton's Response to October 17, 2018 Request, Defs.' Ex. E (Doc. Nos. 40-8–40-12).  However, Book's Opposition materials do not cite or refer to this exhibit either.  See generally Pl.'s Obj.; Pl.'s Mem.; Pl.'s 56(a)2 Stmt.; see also Fed. R. Civ. P. 56(c)(1) ("[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular materials in the record"); Fed. R. Civ. P. 56(e) ("[i]f a party fails to properly support an assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment").  Parties must "cite to specific paragraphs when citing to affidavits or responses to discovery . . . and to cite to specific pages when citing to . . . documents longer than a single page in length. Failure to [do so]  . . . may result in . . . an order granting the [summary judgment] motion . . . ."  D. Conn. L. Civ. R. 56(c)3.

could find the retaliatory intent required for Book's First Amendment claim.  In the absence of any evidence of corruption, there is nothing in Book's claim to support a reasonable juror's inference that the defendants intended to stymie his political speech when responding the way they did to Book's 2018 and 2019 Requests.

Therefore, there is no genuine dispute of material fact as to the Bashar's state of mind. No reasonable juror could find that Bashar's actions constituted a violation of Book's First Amendment rights.  The court grants the defendants' Motion for Summary Judgment on that claim.

    D.    <u>Remaining Claims</u>

        1.    Substantive Due Process Claim

In his Opposition Memorandum, Book states that he "will not pursue his substantive due process claim."  Pl.'s Mem. at 5–6.  The court therefore grants Bashar's Motion for Summary Judgment on this issue.

        2.    Procedural Due Process Claim

Defendants move for summary judgment on Book's due process claim, which Book, in turn, does not oppose.  <u>See</u> Defs.' Mot.; Pl.'s Mem.  The court therefore considers this claim to be abandoned.  <u>See</u> <u>Jackson v. Federal Express</u>, 766 F.3d 189, 197 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); <u>see also</u> <u>Tinnin v. Section 8 Program of City of White Plains</u>, 706 F.Supp.2d 401, 408 n.5 (S.D.N.Y. 2010) (deeming argument abandoned at summary judgment stage where the "[p]laintiff did not respond to [the] argument in her brief"); <u>Taylor v. City of New York</u>, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for

summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

The court grants the defendants' Motion for Summary Judgment on this claim.

### 3.    Inability to Petition to Redress Grievances

Book similarly failed to respond to defendants' arguments for summary judgment on his claim of inability to petition to redress grievances, effectively abandoning the claim.  <u>See</u> Defs.' Mot; Pl.'s Mem.

Therefore, the court grants the defendants' Motion with regard to this claim.

## V.    CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 40) is granted.[17]  The Clerk is directed to close the case.


**SO ORDERED.**

Dated at New Haven, Connecticut this 3 day of October 2022.


　　　　　　　　　　　　　  /s/ Janet C. Hall　　
　　　　　　　　　　　　Janet C. Hall
　　　　　　　　　　　　United States District Judge

---

[17] The defendants also raised a special defense of qualified immunity.  <u>See</u> Defs.' Mot. at 1–2; Defs.' Mem. at 10–15.  In light of the court's decision to grant the defendants' Motion for Summary Judgment for the reasons discussed above, the court does not reach the question.